SAMUEL M. BOWDEN, in Equity, vs. YORK SHORE WATER COMPANY.

York.   Opinion November 22, 1915.   .

*Bill in Equity.   Condemnation proceedings.   Easement.   Eminent Domain:
Fee.   Injunction.   Private and Special Laws of
1911, Chapter 256.   Vested Interest.*

1.  A public service corporation may be authorized to take lands by the
power of eminent domain, for public purposes, but it cannot so take
them for private purposes.
2.  To protect the water shed of a pond from which a water company
· takes its water, so as to protect the purity and conserve the quantity of
the water, is a public use.
3.  To protect the timber growing on the lands of a water company from
possible ravages of fire is a private use, unless the purity and quantity
of the company's water supply is thereby protected; and being a private
use, the taking of other timber lands, from which a fire might spread,
is not authorized.
4.  The Legislature is the sole judge of the exigency or necessity for the
exercise of the power of eminent domain.
5.  Whether the uses for which land is attempted to be taken by the
power of eminent domain. are public, or are private, is a judicial ques-
tion.
6.  Whether a taking by the power of eminent domain has been in good
faith for a public use, or whether it is but a guise for an intended private
use, is a judicial question.
7.  It appearing that the real purpose of a water company in undertaking
to acquire, by the power of eminent domain, a timber lot, a mile distant
from the crest of the water shed of its water supply, was to protect
from the danger of fire its own timber growing on the intervening terri-
tory and on its land adjacent to the foot of its pond, it is held that the
attempted taking was invalid.
8.  The owner of land against which eminent domain proceedings have
been commenced may test the validity of the taking, although he did
not become owner until after the notice of taking had been filed in the
office of the county commissioners, in accordance with the statute.

On report.   Bill sustained with costs.   Writ of permanent injunc-
tion to issue.

This is a bill in equity brought by Samuel M. Bowden against the York Shore Water Company, a corporation, asking for an injunction against said York Shore Water Company restraining it and its successors, assigns, attorneys, agents and officers from taking said real estate of said plaintiff, as in said bill set forth, etc.

Answer and replication were respectively filed. At the conclusion of the evidence in this cause, the same was reported to the Law Court, to be determined upon so much of the foregoing evidence as is admissible, the Law Court to order such decree as justice and equity require.

The case is stated in the opinion.

*E. P. Spinney,* for plaintiff.

*Leroy Haley and Ralph W. Hawkes,* for defendant.

SITTING: SAVAGE, C. J., SPEAR, CORNISH, KING, BIRD, HANSON, PHILBROOK, JJ.

SAVAGE, C. J. Bill in equity praying for an injunction to stay condemnation proceedings by which the defendant is attempting to take the plaintiff's land by an exercise of the power of eminent domain. The case comes up on report.

The defendant is a water company chartered by the Legislature for the purpose "of supplying the towns of York and Wells, or any part thereof, or residents therein, with pure water for domestic, manufacturing and municipal purposes." For these purposes, the corporation is authorized by its charter (Private and Special Laws of 1911, ch. 256) "to take, hold, protect and use the water of Chase's pond in the town of York, and of all other ponds and streams tributary thereto, or running therefrom," and, to "take and hold by purchase or otherwise any lands or other real estate necessary for any of the purposes aforesaid, and for the protection of its water mains and pipes and the water shed of said Chase's pond." The defendant takes its water from Chase's pond, which is one and one-third miles long, and it has acquired the ownership of some land within its watershed. The plaintiff owns a heavily timbered tract of land lying one and one-fifth miles easterly from Chase's pond. The tract contains one hundred and four acres. The deed to the plaintiff bears date March 8, 1913, and was executed on that day.

But it was not delivered to the plaintiff until March 17. In the meantime, on March 12, the defendant filed in the office of the county commissioners, in accordance with statute, R. S., ch. 56, sect. 11, a notice of taking the land with plan and description of the same. It is alleged in the bill and admitted by the answer that in the notice the defendant stated that "it finds it necessary for its purposes and uses in the protection of the water of Chase's pond in said town of York to take certain land within said town of York, and being duly authorized by law to take such land whenever it is necessary for its purposes and uses. Therefore said York Shore Water Company has taken and does hereby take" certain described land, which is the land in question. The filing of the notice was a taking of the land for the purpose described therein. *Penobscot Log Driving Co.* v. *West Branch D. & R. D. Co.,* 99 Maine, 452.

The plaintiff contends that the taking was not a constitutional exercise of the power of eminent domain, and hence that it was invalid and void. But before discussing this question, we must first consider one of the points in defense, namely that the plaintiff was not owner of the land at the time of the taking, and therefore has no such interest as entitles him to maintain this bill. We do not think the point is tenable. It is true the plaintiff did not obtain title until after the taking. It appears that both the plaintiff and the defendant had been negotiating with the then owners for the purchase of the land. The plaintiff offered a little more than the defendant and a deed to him was made and executed March 8. But it was left with the cashier of a bank to be delivered to the plaintiff when it should be ascertained that his check on another bank was good. It was not actually delivered to the plaintiff until March 17, five days after the taking by defendant.

If the taking by the defendant was valid, and if, thereby an absolute fee was vested in the defendant, its present contention might be sound. Whether an eminent domain taking vests an absolute fee is a question concerning which the courts are not in entire accord. In some cases, the character of the use seems to be the determining factor; in others, the provisions of the statute under which the taking is made. In some statutes it is expressly provided that the fee shall vest in the taker; in others, provision is made merely for taking and holding for specified public uses. The charter of this

defendant is of the latter class. The greater weight of authority, we think sustains the proposition that unless a legislative intent is discoverable that an absolute fee shall vest, the taker takes only an easement, or, at most, a qualified, conditionable and determinable fee. And in such case, if the use be abandoned, the entire title is revested in the owner. See for various views, *Harback* v. *Boston,* 10 Cush., 295; *Dingley* v. *Boston,* 100 Mass., 544; *Page* v. *O'Toole,* 144 Mass., 303; *Conklin* v. *Old Colony R. Co.,* 154 Mass., 155; *Troy & B. R. Co.* v. *Potter,* 42 Vt., 265; *People* v. *Blake,* 19 Cal., 579; *Lockie* v. *Mutual Union Tel. Co.,* 103 Ill., 401; *Harris* v. *Chicago,* 162 Ill., 288; *Hagaman* v. *Moore,* 84 Ind., 496; *Shawnee County Comr's* v. *Beckwith,* 10 Kan., 603; *Fairchild* v. *St. Paul,* 46 Minn., 540; 1 Lewis on Eminent Domain, 188.

It is unnecessary in this case, however, to determine the precise character of the interest in the land, which remained in the owner, if the proceedings were valid, and which came to the plaintiff by deed from the owner. If it shall be found that the condemnation proceedings were valid, he cannot on the facts maintain his bill. On the other hand, if the proceedings were invalid, he owns the entire interest in the land, and may have unauthorized and unlawful attempts to take it restrained. The contention of the defendant begs the question. It assumes that the taking was valid. Whether it was is the precise question in issue. In this respect it is immaterial whether the plaintiff took title before, or after March 12. He now has such an interest as enables him to try his rights.

The defendant relies upon the rule stated in *Hayford* v. *Bangor,* 103 Maine, 434, that only the owner at the time of taking can complain. But that case was not like this one. That was an appeal from assessment of damages on account of an eminent domain taking. And it was properly held that, as the damages occasioned by an eminent domain taking belong to whoever is owner at the time of taking, so no one can be aggrieved by the assessment except that owner. This case is not one of damages. This plaintiff would have no standing in a hearing on that question. But he has a standing in a proceeding to determine his rights in the land itself, and to prevent an encroachment upon the same.

Recurring now to the main proposition, we think the discussion will be clearer, if we describe the situation of the land with refer-

ence to Chase's pond, and the contour of the land between them. As already stated, the land is one and one-fifth miles from the pond. Between the land and the pond are two ridges running northerly and southerly in the same general direction as the pond extends. The westerly ridge forms the crest of the water shed of the pond. From that ridge to the plaintiff's land the distance is nearly one mile. Between the ridges is a valley. The ridges are higher, and the valley is lower, than the pond. Through the valley flow three brooks which ultimately empty into Cape Neddick stream, which has its source at the outlet of Chase's pond. By no possibility can water from the plaintiff's land flow into the pond. So much of the water shed of the pond as lies between the pond and the lot in question is only a few hundred feet in width, and it is not shown that it supplies any water to the pond, except suface water. The land in question lies on the easterly slope of the easterly ridge, and drains into a brook, which rising in a swamp on the lot, is dry in dry seasons of the year, and, when it has any water, empties into Cape Neddick stream. This brook not running from Chase's pond, and not tributary to it, is not within the scope of the defendant's charter as a source of supply. And if it was, it could not be made practically useful. Between the lot in question and the pond, there is some land that is covered with timber, some open land which is being, or has been, used for tillage or pasturing, and some area that has been stripped of timber in recent years, with the slash in varying degrees of decay lying on the ground. The defendant owns timber land adjoining plaintiff's lot on the west, and towards the pond, but not within its water shed. It also owns a tract near the foot of the pond, and another near the head. The latter is within the water shed. It has negotiated for other tracts of timber land situated, as we understand the testimony, in the valley between the ridges, and not within the water shed. These facts are all proper for consideration later in determining the real purpose of the taking, and whether the taking was for a public use, or for a private one.

The plaintiff charges that the taking was not made in good faith for the purpose of protecting the water in Chase's pond, or even of protecting the water shed of the pond, or for any purpose for which the defendant was authorized to exercise the right of eminent domain; but that it was, on the other hand, an attempt in the guise of

an eminent domain proceeding to acquire the private property of another, a valuable timber lot, to be held and operated for the profit thereof. We have noticed that the purpose stated in the taking itself is "the protection of the water in Chase's pond." Nothing is said about protecting the water shed. But, passing this omission, we think that the real purpose of the taking, as averred by the defendant at the hearing before the single Justice, is best stated in the language used in testimony by Mr. Josiah Chase, president of the company, and its manager, and principal stockholder. He said:—"Our company has had a great deal of trouble with fires and we have spent a great deal of money fighting fires, and the fires that we have had trouble with have all begun in lots that have been stripped and not far from our lots that are covered with growth; and as we owned and were negotiating for quite a large lot, several lots near there and adjoining, we made up our minds that it was actually dangerous for us to allow that lot to be stripped. The lots beyond there had been burned over and there was no danger practically from that, but if we allowed that to be stripped there was almost, according to our experience, almost a certainty that fire would be in there within a few years, and if fire got in there, there was nothing to stop it from there to Chase's pond, not a thing to stop it, and you couldn't stop it. The growth was nearly all pine there, and we have a 40 acre lot of good, thick pine at the foot of the pond, and it reaches up about half a mile, and which is connected without any road between it, and the only road is just one narrow road in the woods between that lot and the pond." The avowed purpose, then, of taking this land is, by keeping it unstripped, to protect from fire other property of the defendant in the valley and at the foot of the pond, some of which may be within the watershed.

The Legislature conferred upon the defendant the right of eminent domain for public uses. It could confer it for no other kind of use. Of the exigency or necessity for its exercise the Legislature was the sole judge. It is a political or governmental question. Eminent domain is the right of the sovereign state. The State by the Legislature may determine the necessity for itself as to a particular piece of property, or it may determine the general question of necessity, and commit to the corporation to which the power is granted, or to its officers, the right to determine the extent to which

it is necessary to exercise the power. *Riche* v. *Bar Harbor Water Co.,* 75 Maine, 91 ; *Moseley* v. *York Shore Water C,o.,* 94 Maine, 83 ; *Brown* v. *Gerald,* 100 Maine, 351 ; *Brown* v. *Kennebec Water District,* 108 Maine, 227 ; *Hayford* v. *Bangor,* 102 Maine, 345. Under the grant of the power of eminent domain, this defendant had the right to determine in good faith to what extent necessity required the taking of the lands of others, for such public purposes as were specified in the charter. With that question, when the power is exercised in good faith, the court has nothing to do.

But whether the uses for which land is taken by eminent domain are public is a judicial question which must be determined, in case of controversy, by the court. *Riche* v. *Bar Harbor Water Co.,* supra ; *Moseley* v. *York Shore Water Co.,* supra. So, it is a judicial question whether the taking has been in good faith for a public use, or whether the professed public use is but a guise or cover for an intended private use; whether, in short, the exercise of eminent domain in a particular case, is not an abuse of power, a perversion of authority. *Brown* v. *Gerald,* 100 Maine, 351 ; *Brown* v. *Kennebec Water District,* supra. These questions in this case are open for our consideration.

To protect the purity and conserve the quantity of a public water supply is undoubtedly a public use. To protect the water shed of a pond or stream, which is a public water supply, so as to preserve the purity and quantity of the supply is likewise a public use. Such was the case contemplated by the Legislature when it authorized this defendant to take land for the protection of the water shed of Chase's pond. The public have no interest in any other use. But we have seen that no water, and no impurity of any kind, can pass from the plaintiff's lot to Chase's pond, and that such water as flows off the lot is not within the scope of the defendant's charter. It follows that neither the purity nor the quantity of water in Chase's pond can be protected, nor in any way affected by the uses to which this land may be put. It is difficult to believe that the ostensible purpose stated in the notice of taking was the real purpose. Our disbelief is aided by the testimony of Mr. Chase that the taking was for protection against fire. The case contains nothing to show that the ability to control the Bowden lot would in any way tend to the protection of the purity or quantity of the water in Chase's pond.

And we must hold that the purpose declared in the notice of taking was not the true purpose.

Whether a taking for a declared specific public use is invalid, when the declared use is not the true purpose of taking, but when some other public use is served, need not be decided now. For we think the real purpose of the taking, if not to hold and operate the land for profit, was to serve a private, and not a public use. If we take the testimony of Mr. Chase, we are compelled to conclude that the land was sought to be taken as a protection from fire of other timber lands owned by the defendant. And in this connection, we may add that these other timber lands are not shown by the case to be of public use for the protection of the purity or quantity of the water in Chase's pond. If this taking for the avowed purpose can be upheld, there would seem to be no constitutional reason why adjoining lands still further away, if any there were, might not be so taken, and so on. The use of land by the defendant for the protection of its other lands from the spread of fire, at least, when the other lands are themselves not of public use, is clearly a private use. In this case we do not need to define more narrowly.

It is universally held that private property cannot be taken by another under governmental power for private uses. The State can neither do it, nor authorize it to be done. The principle applies as well to a taking by a public service corporation as to one by another corporation or individual. Public service corporations may be authorized to take for public, but not for private, uses. The prohibition is not expressed in the constitution, but it is necessarily implied. 1 Lewis on Eminent Domain, 406. Our Constitution, Art. I Section 21, provides that "private property shall not be taken for public uses, without just compensation, nor unless the public exigencies require it." In discussing this provision, the court, in *B. & P. R. R. Co.* v. *McComb,* 60 Maine, 290, said : "This exercise of the right of eminent domain is, in its nature, in derogation of the great and fundamental principle of all constitutional governments, which secures to every individual the right to acquire, possess and defend property. As between individuals, no necessity, however great, no exigency, however imminent, no improvement, however valuable, no refusal, however unneighborly, no obstinacy, however unreasonable, no offers of compensation, however extravagant, can

compel any man to part with an inch of his estate. The constitution protects him and his possessions, when held on, even to the extent of churlish obstinacy. It is only when the sovereign power declares that a public exigency, to carry out a public purpose, requires that the individual right to possess must yield to the higher demands of the sovereign power, that private property can be taken without consent."

However useful it may be to the defendant to protect its other timber lands from the ravages of fire, it cannot constitutionally do so under the conditions shown in this case, by the exercise of the right of eminent domain. The plaintiff is entitled to the relief prayed for.

> *Bill sustained with costs.*
> *Writ of permanent injunction to issue.*