[Civ. No. 21448.   Second Dist., Div. Two.   July 18, 1956.]

CECIL W. BLUMENSTEIN, Respondent, v. CITY OF
LONG BEACH, Appellant.

Walhfred Jacobson, City Attorney, Joseph B. Lamb, Assistant City Attorney, and Clemons C. Turner, Deputy City Attorney, for Appellant.

Will H. Winston for Respondent.

MOORE, P. J.—The city appeals from a judgment of $5,000 awarded respondent as damages allegedly sustained as a result of the construction of certain highway improvements on the street abutting respondent's parcel of land. Such parcel is a part of the Inner Harbor Tract in the city of Long Beach. The three lots comprising it were purchased in 1946, 1947, and 1948. They are situate at the northeast corner of West Anaheim Street and Harbor Avenue where respondent is now, and for some years past has been engaged in the general auto parts business.

Between August 1950 and July 1953, appellant demolished the old Anaheim Street bridge over the Los Angeles Flood Control Channel located about three blocks to the east of plaintiff's property, and constructed a new bridge. The westerly approaches to the new bridge were constructed in conjunction with the southerly extension of the Long Beach Freeway

View to the west from Anaheim Street Bridge toward intersection of Anaheim Street and Harbor Avenue. The freeway outlet is to the right of the picture. Arrow indicates the Blumenstein property.

which runs parallel with and along the westerly edge of the Flood Control Channel.

Prior to the completion of this construction, respondent's property fronted upon, and was known as 1361 West Anaheim Street. That street was approximately 137 feet wide from property line to property line. The front of respondent's property was improved with a curb, located approximately 24 feet south of and out from the property line. Harbor Avenue is 80 feet in width and is adjacent to the west line of respondent's land. The next intersecting streets to the east were Fashion Avenue, Pico Avenue, and the Flood Control Channel, respectively. However, in conjunction with the demolition of the old Anaheim Street bridge, the city constructed a clover-leaf system of outlets from the Long Beach Freeway which lies to the east of respondent's property. One of these outlets* now passes directly in front of such property, emptying into Anaheim Street at Harbor Avenue, immediately to the west of respondent's land. Fashion Avenue, formerly the next street intersecting Anaheim to the east of Harbor Avenue, now no longer intersects Anaheim at all, but rather merges into the aforementioned freeway outlet to the east of respondent's place and north of Anaheim Street. Thus, an automobile proceeding south on Fashion to the north of Anaheim will pass into the freeway outlet and join its traffic flowing westerly past respondent's property and merging with Anaheim Street at Harbor Avenue. The situation now, looking southerly from respondent's property which formerly abutted Anaheim Street, is (1) the property line, (2) a sidewalk 12 feet wide, (3) the 33.7 foot, three-lane freeway outlet, (4) a concrete construction 9 inches high and approximately 5 feet wide which separates the merging outlet from Anaheim Street for about 300 feet before they converge at Harbor Avenue, and (5) the three northerly lanes of Anaheim Street which carry its westbound traffic.

Following the construction of these public improvements, respondent brought this action in inverse condemnation (see *Rose* v. *State*, 19 Cal.2d 713 [123 P.2d 505]) for $15,000 damages allegedly caused by the construction of the improvements. After trial of the action, the court awarded respondent $5,000 damages, from which award comes this appeal.

The first assignment is that as a matter of law, respondent did not sustain a compensable damage within the meaning

*See illustration, page 265.

of article I, section 14 of the state Constitution which reads in part:

"Private property shall not be taken or damaged for public use without just compensation having first been made to, or paid into court for, the owner . . ."

Since there is no issue of a taking of plaintiff's property, the first question for decision is whether his property has been damaged by the construction of the bridge and freeway outlet in such a manner as to render the detriment suffered compensable under law. ■ The property right assertedly damaged is respondent's easement of access from his property to the abutting highway and to the free and continuous use thereof. This right of ingress and egress attaches to the lot and is a right of property as fully as the lot itself, rather than a mere interest possessed by the public in general in the use of public roads. (*People* v. *Ricciardi*, 23 Cal.2d 390, 397 [144 P.2d 799]; *Eachus* v. *Los Angeles etc. Ry. Co.*, 103 Cal. 614, 617 [37 P. 750, 42 Am.St.Rep. 149]; Dillon on Municipal Corporations, § 712.) ■ An act of the municipality for the benefit of the public which destroys or substantially impairs such easement is damage to the lot itself within the meaning of article I, section 14 of the state Constitution. (*People* v. *Ricciardi, supra.*) Just what is substantial impairment of the easement which will be compensable under law is a problem to be solved by an analysis of the decisions since no statutory or constitutional authority affords an adequate definition.

■ The identical problem as to the proper factors to be included in evaluating the detriment suffered by reason of public improvements has confronted the Supreme Court on prior occasions. In *People* v. *Ricciardi, supra,* the property involved fronted the highway a short distance from a grade crossing constructed by the state agencies on the adjacent highway. In order to eliminate the grade crossing the major portion of the highway was diverted underground a short distance from the intersection, but attained the level of the injured property a short distance beyond it. In order that the owner might not be deprived of access to his property, local "service roads" were constructed on both sides of the underpass. As a result, the property which had formerly fronted directly upon the main highway found itself adjoining a service road 30 feet wide and thereby separated from the main highway. The court affirmed a judgment for damages "based on diversion of the highway from direct access to the

defendant's property." (*People* v. *Ricciardi*, 23 Cal.2d 390, 399 [144 P.2d 799].)

The "service roads" beside the Ricciardi land were 30 feet wide, or substantially the same as the road which serves as an outlet from the freeway and which blocks Blumenstein from the enjoyment of his easement of access to Anaheim Street. While the service road abutting Ricciardi's premises converged with the main highway on both sides of the underpass, that fact was not sufficient to overcome the diversion of such highway from its former position when contiguous to the injured land. A copy of a relief map of the Ricciardi premises, the intersection and the service roads accompanies the opinion on page 409. The majority of the court held that the defendant's easement of ingress and egress had been substantially impaired. The rationale of the decision is that there had not been a noncompensable rerouting of traffic away from the highway abutting upon Ricciardi's property; neither was it the construction of a competing highway which siphoned off traffic that would otherwise have proceeded along the abutting highway; but on the contrary, it was a situation in which defendant's property no longer abutted upon the main highway as formerly but rather, following the construction of the underpass and the "service roads" was removed from contact with the main highway. He no longer had access to the highway which had formerly lain immediately contiguous to his property.

If the doctrine announced in the Ricciardi decision is applied to the facts now before us, it clearly applies, *a fortiori.* Here there was not a "service road" which could under any stretch of the imagination be considered merely a lane of Anaheim Street upon which the property formerly fronted. The freeway outlet enters *into* Anaheim Street immediately west of respondent's property, but the other end of the outlet connects with the freeway and not with Anaheim Street.

Appellant contends that respondent's property still abuts immediately upon Anaheim Street and as proof thereof points out that the property is yet known as "1361 West Anaheim Street," and is separated from the northerly lane of Anaheim by only a low concrete "island"; however, the photographs introduced into evidence distinctly show that the freeway outlet has no connection whatsoever with Anaheim Street until it merges therein immediately beyond plaintiff's property.

Respondent contended to the trial court and again to this

court that the construction of the complained-of public improvements resulted in placing plaintiff's property in a "cul-de-sac"—defined in *Beckham* v. *City of Stockton,* 64 Cal. App.2d 487, 496 [149 P.2d 296] as:

". . . 'a passage or place with only one outlet, as a blind alley . . .' (Webster's New International Dictionary); 'a way, street, or alley open only at one end' (Ballantine's Law Dictionary; 10 Words and Phrases (perm. ed.) 633; 25 C.J.S. 20)."

If respondent's property had been, indeed, placed in a cul-de-sac by the improvements constructed, recovery would be allowed under the theory of *Bacich* v. *Board of Control,* 23 Cal.2d 343 [144 P.2d 818], that blocking access of a property owner from proceeding upon the street upon which his property abuts into the next intersecting street in each direction, by reason of an obstruction rather than mere traffic regulations, substantially interferes with his easement of access. However, disregarding the fact that only one-way westerly traffic was and is allowed on the freeway outlet, the roadway which now abuts upon respondent's property intersects Harbor Avenue immediately to the west of respondent's property and merges with Fashion Avenue to the east. Thus, the Ricciardi decision rather than the Bacich case must be relied upon for recovery.

Notwithstanding respondent's right of recovery is established, we find it impossible to affirm the judgment by reason of the unsatisfactory nature of the evidence which was emphasized by appellant's motion to strike the estimate by plaintiff's only expert witness upon the damage which had been done to plaintiff's easement of access by the construction of the improvement. The estimate of the witness was that the market value of respondent's property had declined to the extent of $15,000 as a result of the construction of the improvement, the property's highest and best use now being industrial rather than commercial. The motion was based on the admission by the witness under cross-examination that he had let factors influence his determination of the decline in market value such as a presumed future loss of vehicular parking in front of subject property due to an anticipated exercise of the police power and a diminution, diversion, and rearrangement of traffic in front of subject property because of the construction of the improvement. ▮ Furthermore, the witness indicated that circuity of travel in attempting to reach the southerly portion of plaintiff's property caused by existing traffic

regulations was a factor in his determination of market value.

The problem of the measure of damages for a properly compensable injury to the easement of access to an abutting highway is fully and completely covered in *Rose* v. *State,* 19 Cal.2d 713, 737 et seq. [123 P.2d 505], in which the facts are substantially the same as those present in *People* v. *Ricciardi, supra.* It was there held that although diminution of market value of the subject property caused by the construction of the complained-of improvement is in general a proper measure of damages in condemnation actions, direct or inverse, the decline in market value must be tempered by an exclusion of loss of value due to noncompensable injury. ▮ Appellate decisions of this state have made it clear that damages resulting from mere diversion of traffic or inconvenience resulting from circuity of travel in reaching the subject property are noncompensable. (*Rose* v. *State, supra*; *People* v. *Ricciardi, supra,* at 397-400; *Beckham* v. *City of Stockton, supra,* at 502; *Holman* v. *State,* 97 Cal.App.2d 237, 243, 244 [317 P.2d 448]; *City of Stockton* v. *Marengo,* 137 Cal.App. 760, 764 [31 P.2d 467].)

. In *Rose* v. *State,* as here, there was an expert witness "A" whose testimony relative to the decline in market value clearly indicated that he had considered noncompensable items of damage in reaching his estimate of diminution in market value. The State there made a motion to strike the *entire* testimony of the witness, which was denied in the trial court, and affirmed on appeal. The reasons given by the court on pages 742-744 of that opinion for the affirmance were that (1) the motion to strike was not directed *with precision at the matter sought to be stricken in that the motion was to strike all the testimony of the witness,* which happened to include some relevant and proper matter; (2) there were two other expert witnesses "B" and "C" whose estimates of the damage caused were not founded wholly on noncompensable factors; (3) the trial judge awarded an amount less, by about one third, than the damages estimated by "A." Thus the court determined that there was no error because of the breadth of the motion, and at least there was insufficient prejudice for reversal.

In the instant action, the motion to strike was not overbroad and was directed solely to the witness's estimate of damage which was admittedly based on noncompensable factors. Therefore, the trial judge should have stricken the estimate. (*People* v. *Dunn,* 46 Cal.2d 639, 640-641 [297 P.2d 964].) Further-

more, the testimony of such witness was the only expert testimony offered on behalf of respondent. The only other witness for respondent was himself, and the major portion of his testimony was admittedly based on information not of his own knowledge but that which had been told him by his accountants and by his expert witness. ▉ Thus, the trial court had no testimony whatsoever on the question of the amount of compensable damage done to plaintiff's property by the construction of the improvement which was not colored by the inclusion and consideration of noncompensable factors. That the trial judge himself was dissatisfied with the extent of the evidence for respondent on the question of damages is implicit in his award of only one-third of the damages estimated by the expert and was expressed at one stage of the trial where he complained that the evidence on this matter was too "sketchy" for his liking. Respondent earnestly contends that the award of only one-third the damages estimated by the expert witness impliedly indicated that the trial judge excluded from his consideration of the damages all those which were due to such noncompensable injury as that caused by diversion of traffic. However, a close inspection and analysis of the evidence discloses that the trial judge had no competent proof to guide him in computing the extent of the detriment suffered by virtue of compensable injuries and consequently he was not in a position to calculate with a fair degree of accuracy the extent of the damages. Therefore, the evidence on the issue of the amount of compensable injury done to respondent's property is insufficient.

The judgment is affirmed as to the issue of liability; it is reversed as to the amount of the award of damages.

Fox, J., and Ashburn, J., concurred.

A petition for a rehearing was denied August 6, 1956, and appellant's petition for a hearing by the Supreme Court was denied September 13, 1956. Traynor, J., was of the opinion that the petition should be granted.